IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MARY GRACE FURNAS,
*as Executrix of the Estate of
Carolyn Ann O'Connor*,

                Plaintiff,

v.                                       CIVIL ACTION NO.   2:23-cv-00168

APPALACHIAN POWER COMPANY and
UNITED AFFILIATES CORPORATION,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendant United Affiliates Corporation's Motion for Summary Judgment* (Document 130), *Defendant United Affiliates Corporation's Memorandum of Law in Support of Its Motion for Summary Judgment* (Document 131), the *Plaintiff's Memorandum in Response to United Affiliates Corporation's Motion for Summary Judgment* (Document 139), and *Defendant United Affiliates Corporation's Reply in Support of Its Motion for Summary Judgment* (Document 144).

The Court has also reviewed Defendant *Appalachian Power Company's Motion for Summary Judgment* (Document 132), *Defendant Appalachian Power Company's Memorandum of Law in Support of Its Motion for Summary Judgment* (Document 133), the *Plaintiff's Memorandum in Response to Appalachian Power Company's Motion for Summary Judgment* (Document 138) (filed under seal), and *Defendant Appalachian Power Company's Memorandum*

*of Law in Support of Its Motion for Summary Judgment* (Document 133). For the reasons stated herein, the Court finds that the motions for summary judgment should be granted.

## MOTIONS TO SEAL

In addition to the motions for summary judgment, the Court has reviewed the *Plaintiff's Motion to Seal Plaintiff's Response to Defendant's Motion for Summary Judgment* (Document 137), the *Plaintiff's Memorandum in Support of Plaintiff's Motion to Seal* (Document 140), the *Plaintiff's Motion to Seal Plaintiff's Response to Defendant's Motion for Summary Judgment* (Document 141) (sealed), *Defendant Appalachian Power Company's Motion to Seal Certain Exhibits and Portions of Its Reply in Support of Its Motion for Summary Judgment* (Document 145) (sealed), and the *Memorandum of Law in Support of Defendant Appalachian Power Company's Motion to Seal Certain Exhibits Attached to Its Reply in Support of Its Motion for Summary Judgment* (Document 146). The Plaintiff filed the entirety of the *Plaintiff's Memorandum in Response to Appalachian Power Company's Motion for Summary Judgment* (Document 138) (sealed) and all exhibits under seal, and the Court has reviewed her brief and exhibits, as well as the documents proposed to be filed under seal attached to Appalachian Power's motion to seal. The Plaintiff filed her brief and exhibits under seal based on potential confidentiality asserted by Appalachian Power as to some documents during the discovery process, and the Court has reviewed *Appalachian Power Company's Response to the Court's May 6, 2024 Order* (Document 147).

Appalachian Power seeks to maintain under seal a document entitled "Design Guidelines for Aerial Lighting and Marking of Transmission Structures" (Document 145-2 and 138-17, 138-18, and 138-19) and the unredacted transcript of the deposition of its 30(b)(6) witness, Katie

2

Earnest (Document 145-3),[1] as well as internal communications by Appalachian Power regarding certain powerlines (Document 138-12).  In addition, it seeks to redact direct quotations from those materials within its brief.  Appalachian Power argues that the Guidelines document contains internal operational material and describes internal policies that should be sealed to protect its confidential business interests.  It further argues that the internal communications contain infrastructure information and budgeting discussion that should not be made public.

"The right of public access to documents or materials filed in a district court derives from two independent sources: the common law and the First Amendment." *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004).  Under the common law, "[t]he trial court has supervisory power over its own records and may, in its discretion, seal documents if the public's right of access is outweighed by competing interests." *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984) (noting factors may include "whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event; and whether the public has already had access to the information contained in the records").  District courts have discretion to determine "whether to grant or restrict access to judicial records or documents" based on the facts and circumstances of the case. *Virginia Dep't of State Police*, 386 F.3d at 575.

---

1 The Court notes that the deposition was submitted in full in accordance with the Court's directive that all exhibits be submitted in their complete form, and only very limited portions of Ms. Earnest's deposition were referenced in the parties' briefing.  Appalachian Power submitted a redacted version of the full deposition at Document 148-2, and the Court appreciates its counsel's efforts to comply with the standards and rules applicable to sealed material by filing redacted versions on the public docket.

3

In contrast, the First Amendment protects a narrower range of documents, but "[w]hen the First Amendment provides a right of access, a district court may restrict access only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Id.* (internal quotation marks omitted). "The burden to overcome a First Amendment right of access rests on the party seeking to restrict access, and that party must present specific reasons in support of its position." *Id.*

After determining whether the common law or First Amendment provides the right of access, a district court "must give the public notice of the request to seal and a reasonable opportunity to challenge the request; it must consider less drastic alternatives to sealing; and if it decides to seal it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing." *Id.* at 476. "Notifying the persons present in the courtroom of the request to seal or docketing it reasonably in advance of deciding the issue is appropriate" to provide public notice. *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984).[2]

Documents attached to a motion for summary judgment are subject to the First Amendment standard, even if the documents were "the subject of a pretrial discovery protective order." *Virginia Dep't of State Police*, 386 F.3d at 576; *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 252 (4th Cir. 1988) (explaining that discovery is "ordinarily conducted in private," while dispositive motions can "serve[] as a substitute for trial"). Thus, the First Amendment standard applies here, and access can be restricted only if there is a compelling countervailing interest. Any such restriction must be narrowly tailored.

---

2 The Court finds that the public has received sufficient notice via the filing of the memoranda detailing the requests to seal on the public docket.

The Court finds that Appalachian Power has met its burden of setting forth a compelling interest supporting maintaining its Guideline document under seal. The Guidelines document contains detailed proprietary information regarding Appalachian Power's business operations. Likewise, the Court finds the redaction of the Rule 30(b)(6) deposition of Katie Earnest to be warranted in order to limit access to the extended discussion of, and quotation from, the Guideline document. However, the Court finds no compelling interest to support sealing the internal communications regarding the transfer of specific powerlines and related budgeting issues. Appalachian Power has not identified any potential harm that would result from public access to those documents. Finally, the Court finds sealing or redaction of the briefs unnecessary. Although the parties quote brief portions of the Guidelines document, the Court sees no risk that those brief quotations reveal any significant confidential information. Accordingly, the Court will direct that the Guidelines document and the unredacted version of Katie Earnest's deposition be maintained under seal, and the remaining documents be filed on the public docket.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The Plaintiff, Mary Grace Furnas, is Executrix of the Estate of Carolyn Ann O'Connor. This litigation arises from a fatal helicopter crash that occurred on June 22, 2022. Ms. O'Connor attended the Freedom Festival in Logan County, West Virginia. During the event, people were invited to co-pilot or ride in a Vietnam War-era Huey helicopter, classified as an Experimental Aircraft. A pilot-in-command was responsible for controlling the flight, and co-pilots, who were not required to be qualified pilots, could take the other front seat, which also had flight controls. Pilots-in-command were provided route maps with two approved routes, as well as sectional maps showing landmarks and features to avoid. Ms. O'Connor took an open seat on the last flight of

the day.  The flight deviated from the approved routes.  Other helicopter pilots testified that the low flight was dangerous, in part because pilots are trained to avoid flying below ridge lines or the horizon, or low over roadways, in order to avoid utility wires.  The helicopter came into contact with a powerline, caught on fire, and crashed.  All six people in the helicopter died.  An autopsy report indicates that Ms. O'Connor died of blunt force and thermal injuries.

Defendant Appalachian Power ceased using or maintaining the powerline at issue in about 1996, and foliage surrounding the powerline was overgrown, making the poles more difficult to see.  The powerline was located on property owned by Defendant United Affiliates Corporation (UAC).  The sectional maps published by the Federal Aviation Administration (FAA) and provided to pilots at the Freedom Festival event depicted the powerline, and the powerline has appeared on sectional maps published by the FAA and its predecessor, the Civil Aeronautics Authority (CAA), since at least the mid-1940s.

The record does not contain definitive evidence as to the precise date the powerline at issue was constructed.  The property was acquired by Boone County Coal Corporation in 1911, and it constructed some powerlines and related equipment.  Appalachian Power (then Appalachian Electric Power Company) and its predecessor, Logan County Light and Power Company, entered into various agreements with Boone County Coal Corporation establishing easements and/or contracts related to the construction, operation, and maintenance of powerlines.  A 1938 Indenture (Document 138-2) references a 1919 agreement under which powerlines had previously been constructed.  The 1938 Indenture established an easement for the construction, operation, and maintenance of powerlines and related equipment, to continue as long as the rights of way and easements were used for the purpose of transmitting power.  Communications between

6

Appalachian Electric Power Company officials, outside counsel, and Boone County Coal Corporation in the early 1940s include discussion of the powerlines and equipment on the property and note ongoing conflict regarding ownership and joint use of certain lines and facilities. The crash line appears to be within the 1938 easement area, although the records before the Court do not establish whether a line existed in that area prior to the easement.

The CAA was established in 1938. It promulgated regulations requiring notice of the construction of certain structures or obstructions within the vicinity of airways in about 1942.[3] Similar regulations still exist. Following notice, the regulatory body determines whether markers or other measures are required to enhance visibility of the obstruction from aircraft. A Sectional Aeronautical Chart cited by the Plaintiff's expert, dated November 1944 and revised March 1947, for Logan, West Virginia, shows at least two airways proximate to the transmission line. (D. Downey Rep. at ¶¶ 20-21) (Document 138-11.) The transmission line depicted on the 1947 Sectional Chart appears consistent with the crash line. The record does not establish when the airways on the 1947 Chart began operations. There is no evidence in the record showing whether any entity provided notice of the line to the CAA, or how the CAA developed the Sectional Chart that depicted the line.

The Logan County Airport began operations in 1993. An aeronautical study was conducted at the time of its construction to identify potential hazards and obstructions. There is no evidence that the powerline at issue was identified as an obstruction at that time. In addition

---

[3] According to the Plaintiff's expert, the CAA's predecessor, the Civil Aeronautics Bureau, issued some bulletins and guidance related to lighting and marking obstructions to air navigation, but the Plaintiff and her expert have not provided the language of any binding regulation requiring notice prior to the 1942 promulgation of Title 14 Civil Aviation, Chapter II – Civil Aeronautic Administration, Part 625. (Downey Rep. at ¶¶ 9-16.) Mr. Downey testified that "there's no documentation that exists right now as to when the notice of mandatory compliance with that came out." (Downey Dep. at 38:: 11-13) (Document 148-3.)

to the Logan County Airport, the Camp Branch Landing Zone is an airstrip located in proximity to the powerline. Both airstrips are at higher elevation above sea level than the powerline. The powerline is approximately 231 feet above ground level. Logan County Airport does not currently have a helipad. The Airport was unaware of any previous helicopter crash in the area or complaints regarding the wires, and there is no evidence before the Court of any previous accidents or contact with the wires.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light

most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

## DISCUSSION

Both Defendants contend that federal law preempts the field of air safety, and the FAA and federal air safety regulations establish the applicable standard of care necessary to find a legal duty. They argue that the powerline did not violate any FAA regulation, reasoning that the line predates the CAA and no notice requirement applies to existing structures, and existing structures

9

are required to be marked only if they are above the established elevation of a nearby airport. The Defendants emphasize that the powerline was below the elevation of the Logan County airport. They urge the Court to reject any contention that broader language in an advisory circular can impose requirements that are not set forth in the regulation. They also note that the powerline appeared on sectional charts, indicating that the CAA and then the FAA (and any pilots relying on such charts) were aware of its existence. In the alternative, they contend that even under the state common law standard, the injury in this case was not foreseeable because the line was not an obstruction, was included on the sectional maps, was located in an area dangerous for flight where no aircraft should have been, and there is no evidence of other incidents in the century since the powerline was constructed.

In addition to their similar arguments that the Plaintiff cannot meet her burden of establishing any legal duty, UAC and Appalachian Power each contend that the other owned the powerline and bore any responsibility for maintaining it and complying with any legal duty surrounding the powerline. UAC further argues that regulations related to maintenance of powerlines apply only to utilities. Both Defendants also argue that the Plaintiff cannot establish entitlement to punitive damages, and Appalachian Power contends that the Plaintiff cannot establish that she is entitled to damages for pre-death pain and suffering.

The Plaintiff argues that factual disputes between Appalachian Power and UAC preclude summary judgment, noting their disagreement as to which entity owned the crash powerline, which entity constructed the powerline, and when the powerline was constructed. She argues that if the crash line was constructed after 1938, Appalachian Power was required to provide notice to the CAA and mark the line. She contends that the "crash line was within 20 miles of three civil

airways when constructed," and was "greater than 150 feet above ground level," meeting the standard for structures requiring notice in place at the time. (Pl's Resp. at 7) (Document 138.) She cites a National Electric Safety Code (NESC) standard providing that lines and equipment that are permanently abandoned "shall be removed or maintained." (*Id.*, citing NESC 214.) She also cites a provision of West Virginia code requiring utilities to seek a permit from the West Virginia Public Service Commission (PSC) to abandon service lines. The Plaintiff emphasizes an internal email in which Appalachian Power employees indicated that removal of the line was left out of the budget and would need to be done at a future date. She contends that the lack of clearing contributed to the hazard because cleared lines provide a visual aid for pilots to recognize that a powerline may be present. The Plaintiff asserts that the Defendants violated specific regulations as well as the common law duty to avoid creating an unreasonable risk of harm to another. She argues that there is no preemption because the various regulations she cites are not in conflict with one another and "do not apply to the same subject matter." (Pl.'s Resp. at 13) (Document 138.) The Plaintiff contends that the Defendants both had duties with respect to the powerlines and poles, regardless of ownership.

"Federal law may preempt state law under the Supremacy Clause in three ways – by express preemption, by field preemption, or by conflict preemption." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007) (internal quotation marks omitted). "Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation," or when the "federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Hillsborough*

11

*Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "The question whether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme." *Id.* at 714.

The Federal Aviation Act does not contain an express preemption provision. It does contain a savings clause, providing that "a remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. § 40120(c).

Although the Fourth Circuit has not addressed whether the field of aviation safety is preempted by federal law, other courts have considered the issue. The Third Circuit provided a thorough overview of the historical context and legislative history surrounding the enactment of the Federal Aviation Act, as well as the comprehensive nature of the statute and accompanying regulations, in concluding that "federal law preempts the general field of aviation safety." *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 371 (3d Cir. 1999). The court further reasoned that the inclusion of the savings clause and a provision requiring airlines to maintain liability insurance "demonstrate that Congress intended to allow for compensation of persons who were injured in aviation mishaps." *Id.* at 375. Thus, the *Abdullah* court concluded that "[f]ederal preemption of the standards of care can coexist with state and territorial tort remedies." *Id.* (ultimately remanding the case, finding potential liability and damages if the plaintiff could establish violation of a regulation barring careless or reckless operation of an aircraft). The Ninth Circuit later adopted the Third Circuit's reasoning and approach, explaining that "when we look to the historical impetus for the FAA, its legislative history, and the language of the Act, it is clear that Congress intended to invest the Administrator of the Federal Aviation Administration with the authority to

enact exclusive air safety standards." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 472 (9th Cir. 2007) (finding that a failure to warn claim related to deep vein thrombosis risks was preempted because federal regulations did not require such a warning); *see also Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 385 (5th Cir. 2004) (more narrowly reaching the same conclusion on a failure to warn claim based on a finding that "federal regulatory requirements for passenger safety warnings and instructions are exclusive and preempt all state standards and requirements"). The *Montalvo* court concluded that "the Administrator has chosen to exercise this authority by issuing such pervasive regulations that we can infer a preemptive intent to displace all state law on the subject of air safety." *Id.* The Sixth Circuit has adopted "the Third Circuit's reasoning in *Abdullah* that federal law establishes the standards of care in the field of aviation safety and thus preempts the field from state regulation." *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 795 (6th Cir. 2005) (finding failure to warn claim regarding an allegedly defective gyroscope to be preempted).

The Tenth Circuit likewise found "that federal regulation occupies the field of aviation safety to the exclusion of state regulations." *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1326 (10th Cir. 2010). The Second Circuit soon followed, holding that "Congress has established its intent to occupy the entire field of air safety, thereby preempting state regulation of that field," although it held that the state and local laws requiring a permit to remove trees from wetlands did not "sufficiently intrude upon the field of air safety to be preempted." *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 208 (2d Cir. 2011). The First Circuit addressed FAA preemption in 1989, but focused the "field" at issue more narrowly

13

to the issue presented by the case, holding that "Congress intended to occupy the field of pilot regulation related to air safety." *French v. Pan Am Exp., Inc.*, 869 F.2d 1, 4 (1st Cir. 1989).

The Supreme Court explains that "prior cases on pre-emption are not precise guidelines…for each case turns on the peculiarities and special features of the federal regulatory scheme in question." *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638 (1973). Even as the Circuit Courts have, by and large, come to a consensus that the FAA preempts the field of air safety regulations, the precise contours of the field, and the outcome of cases asserting preemption, have varied based on the facts presented.

The Court finds that the allegation in this case, that the Defendants' failure to mark a powerline contributed to a helicopter crash, falls squarely within the field of air safety, and the standard of care is established by federal regulations. Thus, the Plaintiff's claim is viable only if she has presented evidence that would permit a jury to find that the Defendants violated a federal air safety regulation. *See, e.g.*, *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 371 (3d Cir. 1999) (holding that state tort remedies remain available, paired with the standard of care established by federal regulations); *Crout v. Haverfield Int'l, Inc.*, 269 F. Supp. 3d 90, 96 (W.D.N.Y. 2017) (likewise explaining that plaintiffs "may still seek remedies based on state law" for harm caused by violations of FAA regulations).

FAA regulations provide that an "existing object" constitutes an "obstruction to air navigation" if it is greater than "499 feet AGL [above ground level] at the site of the object" or "200 feet AGL, or above the established airport elevation, whichever is higher, within 3 nautical miles of the established reference point of an airport." 77 C.F.R. 77.17 (a)(1)-(2). The undisputed facts establish that the crash line is approximately 231 feet above ground level and is

14

at a lower elevation than either nearby airstrip. Thus, the Plaintiff cannot establish a violation of the regulations related to existing objects.

In their current form, FAA regulations also require notice of "any construction or alteration that is more than 200 ft. AGL at its site," if requested by the FAA or at the time an entity proposes the construction or alteration. 14 C.F.R. § 77.9(a). Notice serves multiple purposes:

> Notice received by the FAA under this subpart is used to:
> (1) Evaluate the effect of the proposed construction or alteration on safety in air commerce and the efficient use and preservation of the navigable airspace and of airport traffic capacity at public use airports;
> (2) Determine whether the effect of proposed construction or alteration is a hazard to air navigation;
> (3) Determine appropriate marking and lighting recommendations, using FAA Advisory Circular 70/7460–1, Obstruction Marking and Lighting;
> (4) Determine other appropriate measures to be applied for continued safety of air navigation; and
> (5) Notify the aviation community of the construction or alteration of objects that affect the navigable airspace, including the revision of charts, when necessary.

14 C.F.R. § 77.5(c).

The Plaintiff's hurdle in relying on the notice requirements is a lack of evidence of any violation, in contrast to *Eiserman v. Kentucky Fuel Corp.*, 2016 WL 1732728 (E.D. K.Y. 2016), relied upon by the Plaintiff, wherein the court found that notice should have been provided to the FAA. Firstly, there is no evidence that the powerline was constructed or altered, within the meaning of the FAA regulation, after the effective date of the first notice requirement. The Plaintiff points to her expert's recitation of the history of air safety regulation, which includes statements claiming a notice requirement pre-dating the 1942 enactment of Part 625. The language of any such regulation is unavailable to the parties or the Court. It is impossible for the

Court to determine whether the Plaintiff has presented evidence of a violation of a regulation based only on vague assertions that some requirement to provide notice existed, and it would be impossible for the Court to instruct a jury as to the law without the language of any applicable regulation. Thus, the Court can consider only the 1942 regulation which is partially reproduced in the Plaintiff's expert's report. It requires notice of the "construction or alteration" of "[a]ny structure along or within 20 miles of, a civil airway, the top or any part of which is, or may become, by reason of such construction or alteration, greater than 150 feet above ground level." (Downey Rep. at ¶ 15, quoting from Part 625 of Civil Aeronautic Administration, Title 14 Civil Aviation, Chapter II.) The exact date of construction of the powerline is not available, and there is no evidence which would permit a jury to conclude that the powerline was constructed after 1942. The Plaintiff argues that a factual dispute regarding the construction date precludes summary judgment. While the parties have taken divergent positions as to the date of construction, there is no material *factual* dispute because there is simply no evidence sufficient to establish the date with any certainty. The line appears on a 1947 map, and there is substantial evidence that it is located within an easement established in 1938. There were powerlines on the Boone County Coal Corporation property beginning in the early 1900s, but there is not sufficient evidence to permit a conclusion as to whether the crash line was constructed prior to the 1938 easement.

Secondly, even if a jury could find that the powerline was constructed after the regulation went into effect, there is no evidence of the date(s) of construction of the airfields within 20 miles of the powerline, except their appearance on a 1947 map. Thirdly, adding to the pyramid of speculation required to adopt the Plaintiff's theory of the case, there is no evidence that Appalachian Power failed to provide notice. The Plaintiff's expert apparently concluded that no

16

notice was provided because (a) the line is not marked and (b) Appalachian Power was unable to produce records establishing that it had provided notice in discovery.[4]  (Downey Dep. at 42::7-20) (Document 148-3.)   But there was no review of CAA records, which may no longer exist, and a company's failure to maintain records for *eighty years* is hardly sufficient evidence of a violation. Thus, construing all evidence and inferences in her favor, the Plaintiff is unable to carry her burden to establish violation of a notice requirement.[5]

The Plaintiff contends that the Defendants also violated a provision of the National Electric Safety Code (NESC) requiring lines that are permanently abandoned to be "removed or maintained in a safe condition."  NESC 214.  The Plaintiff argues that the abandoned lines were rendered unsafe by the overgrown tree and vine vegetation, which reduced visibility of the poles from the air.  "The violation of a regulation…gives rise to liability only when the plaintiffs are within the class of persons protected by the regulation and the harm they suffer is of the type the regulation was intended to prevent."  *McMellon v. United States*, 395 F. Supp. 2d 422, 431 (S.D. W. Va. 2005) (Goodwin, J.).  Even if allowing vegetation to grow around an abandoned, out-of-service, de-energized line could constitute a failure to maintain the line in a safe condition, the Court finds that the Plaintiff is not within the class of persons protected by the regulation, given that air safety hazards are regulated exclusively by the FAA and attendant regulations.  In short, having found

---

[4] The line is included on the 1947 Sectional Map.  Mr. Downey states elsewhere in his report that "the only way for the CAA to be aware of obstructions was for owners to provide that information to the CAA."  (Downey Rep. at ¶ 8.)  Applying that logic, one could conclude that Appalachian Power must have provided notice of the powerline.  However, the Court notes other evidence in the record indicating that existing obstructions may be identified and mapped prior to construction of airports or airfields.

[5] It is not at all clear that even evidence of violation of the notice requirement would be sufficient to establish liability under these facts.  Notice does not automatically require marking, and there is no evidence in the record that the FAA typically requires marking of powerlines in areas with similar topography and distance from airways.  There is also no evidence of any previous accident, close call, or concern with the powerline, which existed for somewhere between eighty and one hundred years prior to this accident.

that the FAA preempts the field of air safety, another regulation cannot be the basis of liability for a failure to mitigate a risk posed only to those engaged in air travel.

Likewise, the Plaintiff's suggestion that Appalachian Power was required to obtain a permit from the West Virginia Public Service Commission to abandon the powerline is unavailing, for the same reasons the NESC regulation cannot form the basis of a duty to the Plaintiff. In addition, the plain language of W. Va. Code § 24-3-7(a) requires a permit to abandon operation of lines only if doing so "would affect the service it is rendering the public." There is no indication that abandonment of the crash line in this case impacted service to the public.

Thus, the Plaintiff has not met her burden of putting forth evidence from which a reasonable jury could find that either Defendant violated any duty owed to Ms. O'Connor. None of the factual disputes identified by the Plaintiff are material in light of her failure to identify evidence of a violation of the applicable standard of care, drawn from federal regulations occupying the field of air safety. Therefore, the Defendants' motions for summary judgment should be granted.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant United Affiliates Corporation's Motion for Summary Judgment* (Document 130) and Defendant *Appalachian Power Company's Motion for Summary Judgment* (Document 132) be **GRANTED**.

In addition, the Court **ORDERS** that the *Plaintiff's Motion to Seal Plaintiff's Response to Defendant's Motion for Summary Judgment* (Documents 137 & 141) be **GRANTED in part and DENIED in part**, and that *Defendant Appalachian Power Company's Motion to Seal Certain Exhibits and Portions of Its Reply in Support of Its Motion for Summary Judgment* (Document

145) (sealed) be **GRANTED in part and DENIED in part**. The Court further **ORDERS** that the following documents be maintained under seal: Document 138-17, 138-18, 138-19, 145-2, and 145-3. The Court **ORDERS** that the remaining documents and exhibits at Docket Entries 138 and 145 be **FILED on the public docket**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: August 29, 2024

*[signature]*
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA